Bergan, J. (dissenting).
The effect of the decision now being-made is that it will become the mandatory duty of a Judge before whom is returnable a writ of habeas corpus sued out by a patient in a State hospital for the mentally ill to assign counsel *260 to prosecute the writ. Presently such assignment of counsel is a discretionary matter with the Judge; and it should remain that way.
There are some adversary trials with counsel now in cases where it is indicated to be necessary; but the new rule will greatly enlarge their number.
There is no possible hope that any good can be accomplished by the procedural innovation now being fashioned. The legal profession will be burdened by a frustrating and futile extension of its responsibilities in attempting to review by many new adversary trials current medical judgments of psychiatrists; the physicians themselves will be interrupted in their heavy schedules to prepare running forensic justification in a court for their medical judgments; and no one could pretend that a mentally ill patient could be helped by all this or that it would be conducive to good hospital management.
The view has been expressed in some intra-professional legal discussions that every patient should be represented by counsel in judicial inquiries that test his need for new or continued medical treatment (see, e.g., Lindman and McIntyre, The Mentally Disabled and the Law, American Bar Foundation Report, 1961, p. 29; Mental Illness and Due Process, 1962, Association of the Bar of the City of New York); and there has been some judicial expression, too, in this direction, e.g., Howard v. Overholser (130 F. 2d 429) and Dooling v. Overholser (243 F. 2d 825, 828).
The basic concept in these contentions is that a mental hospital is equated to a prison. The two ought not be equated. They are totally different. The fact that a temporary deprivation of freedom exists in both does not make them alike.
A man is put in prison to punish him. A patient is in a hospital to help him. He is there to treat his illness because in the present state of science no better way to treat him has been discovered.
He is there because the People of New York at an operational cost to themselves in the 1965-1966 budget of $293 million and an additional $94 million for new facilities are interested in helping him get well.
Adversary trials have played a vital role in the preservation .of our liberties and in the effective administration of justice; *261 but they are not a cure-all for every social or public problem and their usefulness in prodding competent medical staffs into better diagnoses of mental illness or more effective releases from hospital care of patients able to be released is illusory.
The published records of the Department of Mental Hygiene demonstrate the present average stay of the newly admitted mentally ill patient in State hospitals is four months.* In the 10 years from 1955 to 1965 this has been cut in half. In 1955 the average stay was eight months.
Mental hospitals, working under quite the same pressures and for quite the same reasons as general medical and surgical hospitals, have been trying consistently to reduce the time of hospitalization.
Even though there has been an increase in total admissions in the 10 years from 1955 to 1965, there has been a consistent reduction in the number of “ resident patients ” (those in hospitals) in the 10-year period. In June, 1595 there were 93,550 resident patients; March 31, 1965 there were 84,637 or a reduction of 8,913. During this period the annual rate of admissions increased by 58% but releases increased 118%.
The department’s comment on this is of direct relevancy to the question on hand: ‘ ‘ The continuing growth in admissions is due not to a rise in the incidence of mental illness but rather to increasing longevity, increasing general population, increasing demand for psychiatric care, and increasing public confidence in state hospitals and in the effectiveness of their therapeutic programs. The essential element in the falling population trend is a reduction in the average length of hospitalization. * * * The higher release rate is a direct result of vast improvements in the therapeutic program including large scale use of the tranquilizing drugs, intensive treatment for newly-admitted patients, the development of milieu therapy, and the establishment of the open ward policy in which New York State led the nation.” (State Programs for The Mentally 111 and Mentally Retarded, N. Y. State Dept, of Mental Hygiene, p. 2.)
*262 The reduction in the number of resident patients is accompanied by increases in out-patient treatment in various facilities not requiring resident hospitalization. In the 1961 Report, for example, on March 31, 1960, 93,855 patients were resident and on March 31, 1961, 92,586; and during this period there were 48,066 “additions” and 49,335 “removals”. In the same period the out-patients increased from 75,524 to 86,121.
In the 1964 Statistics of State Mental Hospitals, the latest full statistical tables which have been published, there were 85,961 resident patients on March 31, 1963 and 85,278 a year later. This and other material make it obvious that a prime objective of good hospital treatment is to get the patient out—not to keep him in.
The department notes this in its Programs (supra, p. 1): ‘ ‘ Dramatic changes have been taking place throughout the country in the past few years in the approach to the treatment of mental disorders. New York State has been in the forefront of this movement. It was the first state in the nation to have a master plan for mental health.”
There are, of course, borderline cases where conservative medical judgment foresees some danger in releasing a patient. The present appellant, who had shown assaultive tendencies against his mother and who is obviously still mentally ill, seems to present such a case. Public opinion has not been notably tolerant of mistaken predictions by psychiatrists of the future course of mental disease by a person who has been released on medical recommendation.
And Judges, looking with the benefit of hindsight at mistakes in diagnosis and treatment, have had a tendency to keep psychiatrists well on the safe side of recommendations. One might look, for example, at the effect of Collins v. State of New York (17 N Y 2d 542) which imposed a State liability for a mistaken psychiatric judgment on the degree of protective special care against suicide needed by the patient.
It is unlikely, to say the least, if Judges undertake on an enlarged scale, as the result of adversary trials, to supervise the current diagnosis of psychiatric staffs affecting risks to be taken in the future, as distinguished from looking back at and making value judgments on past psychiatric mistakes, that they will improve things or visibly affect the liberties of patients.
*263 If a reputable psychiatrist has a reservation about a patient who may in the future do damage to himself or kill his nearest friend, it will not be often that a Judge will take the risk because there is psychiatric proof before him the other way in a contested trial.
Thus the adversary trial of medical issues implicit in the universal and compulsory assignment of counsel in every habeas corpus proceeding by a patient in a mental hospital seems at once unwise and injudicious.
As the Department of Mental Hygiene itself notes, the revised New York statute (L. 1964, ch. 738, eif. Sept. 1, 1965) provides for “ periodic court re-examination of the retention of involuntary patients ” and this is regarded by the department as a “significant” change accomplished by the new statute. The beneficial effects of section 86 and new section 88 of the Mental Hygiene Law are examined in People ex rel. “ Anonymous ” No. 1 v. La Burt (17 N Y 2d 738).
Also significant, as the department sees it, is the ‘1 establishment of a mental health information service, as an arm of the judiciary, to gather information for the court and to advise patients and their relatives of their rights under the law.”
Thus the legal problem raised by the continuance of hospital care is placed in the sound discretion of experienced and conscientious Judges and is a subject of periodic review. This kind of judicial inquiry is a marked improvement over the uneven and haphazard chance of patients making applications for writs of habeas corpus. There may be times when it will be appropriate for Judges to assign counsel; it is quite inappropriate to hold they must always do so.
The nature of the lawyer’s duty on assignment is essentially unsuited for on-going medical diagnosis. The lawyer, upon his assignment, must make out the best legal case he can for the discharge of the patient. The long tradition of the legal profession and its highest demands of duty require him to prosecute the writ with his best legal skill and ability.
He does not have a medical responsibility for the over-all good of the patient—his professional legal responsibility is toward sustaining the writ. And, of course, some, perhaps many, psychiatric estimations of future prognosis are arguable, but the *264 lawyer is bound to advance that view which releases the patient from hospital care. This would regularly overrule the responsible medical staff judgment related to the kind of treatment needed. The possibilities of disservice to mentally ill patients in the enlargement of litigation could be significant.
The order should be affirmed.
Chief Judge Desmond and Judges Fuld, Van Voorhis and Burke concur in Memorandum ; Judge Keating concurs in the result in a separate memorandum; Judge Bergan dissents and votes to affirm in an opinion in which Judge Scileppi concurs.
Order reversed, etc.

 The statistical and other statements are from 73rd Annual Report of Department of Mental Hygiene for 1961 (N. Y. Legis. Doc., 1962, No. 117); 1964 Statistics of State Mental Hospitals, N. Y. State Dept. of Mental Hygiene; and the current edition of State Programs for the Mentally Ill and Mentally Retarded, promulgated by the Department of Mental Hygiene.